# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

JENNIFER CAMPBELL AND JEREMY PENNINGTON,

    Plaintiffs,

           v.

CITY OF SYCAMORE,

    Defendant.

Case No. 1:20-cv-06476

JURY DEMANDED

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    PARTIES ............................................................................................................. 3

III.   JURISDICTION AND VENUE ........................................................................... 4

IV.   BACKGROUND ................................................................................................. 4

      A.   Sycamore has long neglected its water system and the miles of deteriorating water mains that comprise it. ...................................................................... 4

      B.   Sycamore's corrosion control treatment continues to fail, allowing toxic metals and harmful bacteria to pollute residents' water without any action by the City. ....................................................................................................... 8

      C.   The City's failure to properly maintain its water supply and corrosion control treatments has had disastrous effects on its residents' daily lives. ............... 10

      D.   The City has continued to deny any issues with the water, prejudicing the residents of Sycamore and knowingly concealing its own negligent actions. ........... 11

      E.   Plaintiffs' experiences with Sycamore water demonstrate the problems with Sycamore water and the City's attempts to obfuscate the same. ............................. 12

            1.   Jennifer Campbell ................................................................................. 12

            2.   Jeremy Pennington ................................................................................. 14

V.     CLASS ALLEGATIONS ...................................................................................... 15

VI.   COUNTS ............................................................................................................ 17

      FIRST COUNT .................................................................................................. 17

      SECOND COUNT ............................................................................................. 18

      THIRD COUNT ................................................................................................ 20

      FOURTH COUNT ............................................................................................ 21

      FIFTH COUNT ................................................................................................. 22

      SIXTH COUNT ................................................................................................. 23

VII.  PRAYER FOR RELIEF ...................................................................................... 24

010958-11/1365605 V1

## I.     INTRODUCTION

1.      The City of Sycamore, Illinois, has a water problem. Hundreds of Sycamore residents describe water that assaults the senses. The water has a cloudy, red-orange color that stains dishes, bathtubs, sinks, clothes, or anything it touches. The water smells like sewage—so foul, metallic, and rotten that it causes persons to gag. The water tastes metallic or "like blood."

2.      The impact on Sycamore residents has been colossal. Residents must purchase masses of bottled water to drink, cook with, and brush their teeth. Many residents have given up on washing their dinnerware, and switched to using disposable plates and utensils to avoid having to use the sink. Even a shower can engulf one's home in the water's wretched scent.

3.      But more gravely, many continue to develop related health issues. Cancer rates in Sycamore are very high. Young girls have reported inexplicably losing patches of hair. Some children who have consumed the water their entire lives have suddenly started exhibiting aggressive behavior. Others report bizarre neurological issues that confound their doctors.

4.      Residents began complaining in the summer of 2016, when issues with the water became more noticeable. Yet, the City of Sycamore assured residents that their drinking water was safe to consume. The City consistently touted that the water meets or exceeds all standards set by the Environmental Protection Agency (EPA). And the City repeatedly rejected the notion of a citywide problem. Instead, the City dismissed complaints about Sycamore's water quality as an individual problem and blamed any issues on water heaters or fixtures in the homes of the complaining residents.

5.      For years, residents accepted the City's explanations and turned to their homes to investigate possible sources of water contamination. Some residents have spent thousands on abatement measures, like purchasing new water heaters, installing filtration systems, and hiring

- 1 -

plumbers. Yet the issues never improved. And during warm spring and summer months they only seemed to get worse.

6.     In recent months, however, the City's assurances regarding water safety have grown increasingly dubious. Concerned residents formed a group, Citizens for Clean Water Sycamore, which in a few weeks grew to over 500 members. One by one, residents began sending their water samples to private labs for testing. The results showed elevated lead levels in practically every home tested, and in homes all over town. One home had lead levels in excess of 200 parts per billion (ppb), more than ten times the action level. Even new homes without lead service lines reported elevated lead levels.

7.     Unfortunately, the source of these problems points back to the City—which has recklessly deferred maintenance, avoided replacing failing century-old water mains, and ignored problems with the City's corrosion control treatments.

8.     Sycamore has a large number of antiquated cast iron water mains that have been rapidly deteriorating. And the City has put off replacing them for decades. As these cast iron water mains deteriorate, they develop pits and pockets of damage, allowing large amounts of iron particulate to enter the City's water supply. This iron particulate then enters people's homes, staining tubs, dishes, and other personal items, while also negatively impacting the taste and appearance of the water. But more importantly, the iron interferes with treatments that the City adds to the water to protect the residents.

9.     First, the iron interacts with an orthophosphate treatment added to the water, which normally would coat the inside of any metal fixtures in the water system and provide a barrier to prevent metals leaching into the water supply. Without this protection, lead from solder,

joints, service lines, and plumbing have contaminated water throughout Sycamore's system, leading to high lead levels in homes.

10.    Second, the iron reacts with chlorine treatments, allowing bacteria to flourish. At best, that bacteria gives the water a foul taste and putrid odor. At worst, the waterborne bacteria seriously threatens the health of the residents, allowing harmful—and possibly even fatal—diseases to thrive.

11.    The result is a public health crisis. The City's corrosion control treatments cannot be trusted. And hundreds of residents lack the most basic of human needs: clean, safe drinking water.

12.    In short, the City has created and exacerbated a public nuisance. It has violated its residents' constitutionally protected interests related to bodily integrity and state-created dangers. It has negligently maintained its water supply and corrosion control treatments. It has misrepresented the safety of the drinking water, a commodity for which residents continue to pay the City. And as the proximate result, Plaintiffs and the Class have suffered bodily harm, monetary losses, and actual damages. They are entitled to relief.

## II.    PARTIES

13.    Jennifer Campbell resides with her family at 440 Edward Street, Sycamore, Illinois 60178. She has lived in Sycamore and consumed its water for most of her life. Around 2016, she noticed the water quality in her home deteriorate, and develop a strong, foul odor and yellowish-brown color. She has repeatedly complained about the quality of her water to the City, which assured her every time that the water is safe and that she is the only resident who complains about the water. In mid-2020, she sent a sample of her water to a private lab to be tested, which revealed lead levels as high as 64 ppb.

14.     Jeremy Pennington resides with his family at 622 Park Avenue, Sycamore, Illinois 60178, where they have lived since January 2013. In the spring of 2016, his family noticed discolored, foul-smelling water when taking showers and when brushing their teeth. Since then, he has repeatedly complained about his family's experience with the water to the City, who assured him every time that the water is safe and that he is the only resident who complains about the water. In October 2020, he had his water tested by a private lab, which revealed lead levels of 8.4 ppb.

15.     The City of Sycamore is a municipal corporation in DeKalb County, Illinois.

### III.     JURISDICTION AND VENUE

16.     This is a civil action brought under 42 U.S.C. § 1983 seeking injunctive and declaratory relief together with monetary damages against the City of Sycamore for violations of the Fourteenth Amendment of the United States Constitution.

17.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331, which authorizes federal courts to decide cases concerning federal questions; 28 U.S.C. § 1343(a)(3) and (4), which authorizes federal courts to hear civil rights cases; 28 U.S.C. § 2201, the Declaratory Judgment Act; and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

18.     Venue is proper in this Court because the parties all reside in the Northern District of Illinois, and all of the alleged conduct occurred in the Northern District of Illinois.

### IV.     BACKGROUND

**A.      Sycamore has long neglected its water system and the miles of deteriorating water mains that comprise it.**

19.     Sycamore is a city located in DeKalb County, Illinois. It is home to nearly 20,000 residents. Incorporated in 1869, Sycamore has a very old water system.

20.   The City draws its drinking water from four wells underground. It then treats that water with minerals and chemicals before supplying it to residents through more than 600,000 feet of water mains.

21.   Sycamore, like many municipalities, treats its water with a compound, orthophosphate, to inhibit corrosion of all the mains, pipes, and service lines in its system.[1] Generally, the orthophosphate reacts with the pipes as it passes through the system "to form compounds that have a strong tendency to stay in solid form and not dissolve into water."[2] This creates a barrier between the water and the pipe to protect from toxic metal corroding into the water supply.

22.   Sycamore also adds chlorine to its water, like most public utilities. This treatment controls bacteria and "effectively kills a large variety of microbial waterborne pathogens, including those that can cause typhoid fever, dysentery, cholera and Legionnaires' disease."[3]

23.   But whatever good the City intends by these treatments under normal circumstances, it has undone through its blatant failures in maintaining the water system.

24.   The source of the problem stems from the water mains. Of the approximately 115 miles of water mains, the City installed more than 43 miles in the early 1900s. And these

---

[1] City of Sycamore, *Water Quality Testing and Reporting*, available at https://cityofsycamore.com/public-works/water-quality-testing-and-reporting/ (last visited Oct. 27, 2020) ("The City of Sycamore utilizes corrosion control treatment by the addition of a phosphate blend to the water at the individual Well sites.").

[2] *See* EHS Daily Advisor, *Drinking Water: Phosphate Corrosion Inhibitors*, https://ehsdailyadvisor.blr.com/2018/03/drinking-water-phosphate-corrosion-inhibitors/ (last visited Oct. 29, 2020).

[3] John J. Calomiris & Keith A. Christman, *How does chlorine added to drinking water kill bacteria and other harmful organisms? Why doesn't it harm us?*, Sci. Am. (May 4, 1998), *available at* https://www.scientificamerican.com/article/how-does-chlorine-added-t-1998-05-04/.

timeworn pipes made of dated building materials—namely, cast iron—have long exceeded their expiration date. The City has known this much for decades.

25.     A "2019 Water Master Plan" posted by the City on its website characterizes the water system "as **relatively fragile** due to the age of the water main piping and the materials that much of it was constructed using (e.g. cast iron)."[4] And that's before accounting for the corrosiveness of the soil in which those water mains sit.

26.     The United States Department of Agriculture measures, grades, and maps out the corrosiveness of soil throughout the country. Approximately 98% of the City's service area falls "within the 'high' corrosivity soil areas."[5]



*Map of Sycamore Soil Corrosivity*

---

[4] City of Sycamore, *2019 Master Water Plan* at 3-6 (Dec. 2019), *available at* https://cityofsycamore.com/wp-content/uploads/2020/06/Sycamore-2019-Water-Master-Plan-Amended-Sheet-4-34.pdf.

[5] *Id.* at 3-7.

27.     These corrosive soils react with construction materials and eat away at the iron water mains, leading them to disintegrate and crumble underground.



*Corroded and damaged water mains*

28.     A rash of water main breaks throughout Sycamore illustrates the problem. In recent years, older water mains have resulted in leakage or full breaks, especially in Sycamore's central downtown, where the mains are older.[6]

29.     Despite knowing the frailty of these water mains, Sycamore's plan with respect to these aging pipes has been largely reactive. Instead of taking action to replace these pipes *before* they corrode, leak, or rupture, the City has deferred "[t]he majority of rehabilitation work . . . in response to leakage or water main breaks."[7] But as the City knows, years—if not decades—of decay precede these breakages. And during those years of decay, contamination of the water supply occurs underground in multiple ways, threatening the health and safety of Sycamore residents.

---

[6] *Id.* at 3-6.

[7] *Id.*

**B.      Sycamore's corrosion control treatment continues to fail, allowing toxic metals and harmful bacteria to pollute residents' water without any action by the City.**

30.      Residents in Sycamore almost universally complain of a visual problem with their water: it "runs red." Orange-tinted sediment collects at the bottom of water bottles. Porcelain showers, sinks, and tubs turn from white to rust-colored. Plates and bowls stain.



*Left: Tap water collected from Sycamore residence*
*Right: Bathtub from Sycamore residence*

31.      Excessive iron in the water causes this discoloration. And the red color is not only unsightly, it's an actual red flag: it means the City's orthophosphate corrosion control methods aren't working.

32.      Indeed, no amount of corrosion control can spare rotting pipes from the ravages of time. Century-old water mains invariably suffer from pits and pockets of damage. These damaged portions of the water mains will then inevitably deposit iron particles into the water.

33.      As this iron accumulates in the water, it interacts with the chlorine added by the City to kill bacteria or prevent its growth. The iron also interferes with the phosphates added to the water by the City to inhibit corrosion in the water system. These reactions tragically compromise the safety of Sycamore's water supply.

- 8 -

34.     Without adequate chlorine treatment, harmful bacteria can grow unfettered. Rotted out pipes with holes, cracks, and crevices form an ideal environment for bacteria to thrive, especially in warmer months. Even fatal waterborne illnesses, such as Legionnaire's disease, can unwittingly spread.

35.     What's more, without proper corrosion control, not just iron will leach into the drinking water. Despite the United States banning the use of lead in 1986, lead remains present throughout Sycamore's water system. Lead-comprised service lines, joints, solder, and plumbing pose a major contamination threat to Sycamore residents.

36.     Lead is an extremely dangerous environmental contaminant.[8]  Once consumed, it persists and bioaccumulates in the body over time.[9] It travels via the blood stream to soft tissue and organs, before ultimately settling in one's bones and teeth, where it remains for years.[10]

37.     Generally, such lead exposure harms an individual's nervous system, causing a number of medical afflictions, including neuropathy, motor nerve dysfunction, weakened immunity to disease, renal failure, gout, hypertension, muscle and joint pain, memory and concentration problems, and infertility.  Experts have also identified lead exposure as a probable carcinogen.[11]

---

[8] Mary Jean Brown & Stephen Margolis, *Lead in Drinking Water and Human Blood Lead Levels in the United States*, 61 MORBIDITY & MORTALITY WKLY. REP. (SUPP.) 1, 1 (Aug. 10, 2012), *available at* http://www.cdc.gov/mmwr/pdf/other/su6104.pdf.

[9] EPA, *Basic Information About Lead in Drinking Water*, https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water#regs (last updated Aug. 4, 2020).

[10]EPA, *EPA's Lead-based Paint Enforcement Helps Protect Children and Vulnerable Communities*, https://www.epa.gov/enforcement/epas-lead-based-paint-enforcement-helps-protect-children-and-vulnerable-communities (last updated Dec. 4, 2017).

[11] Brown & Margolis, *supra* note 8, at 2; World Health Organization, *Lead in Drinking-water: Background document for development of WHO Guidelines for Drinking-water Quality*, 5–8 (2011), *available at* http://www.int/water_sanitation_health/dwq/chemicals/lead.pdf.

38.     For a child, the effects of lead poisoning are even more dramatic.  Lead stunts brain development, reduces IQ, and intensifies aggression and other behavior problems later in life. According to the EPA, low levels of lead exposure to children have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells.[12]

**C.      The City's failure to properly maintain its water supply and corrosion control treatments has had disastrous effects on its residents' daily lives.**

39.     The impact of the City's failings has been more than just a minor inconvenience to Sycamore residents.

40.     The bacteria in the water causes a terrible, sewage-like stench, which turns otherwise mundane activities into terribly unpleasant, if not impossible chores. Residents report being unable to wash their clothes at home, and needing to take their laundry to a laundromat. Many must use disposable plates and utensils to avoid having to wash dinnerware. Guests find the stench that comes from the sink repulsive. Showers cause the entire home to smell rotten.

41.     The odor also defeats any will to consume the water. Residents must spend hundreds a year on crate after crate of bottled water with which to cook, drink, and brush their teeth.

42.     But more gravely, many continue to develop health issues consistent with lead toxicity. Parents struggle to cope with children who suddenly begin exhibiting aggressive behavior, attention deficit disorders, and diminished motor functions. Some residents report inexplicably

---

[12] EPA, *Basic Information About Lead in Drinking Water*, *supra* note 9.

losing patches of hair. Other Sycamore residents report bizarre neurological issues (similar to a brain tumor) that have required MRIs and endless diagnostic testing.

43.     These abatement measures and medical bills have added up. Some residents have spent tens of thousands of dollars, as they futilely attempt to remedy the issues with their water supply.

**D.     The City has continued to deny any issues with the water, prejudicing the residents of Sycamore and knowingly concealing its own negligent actions.**

44.     To make matters worse, the City has refused to help residents investigate the true source of the deteriorating water quality. In fact, it has willfully deflected any concerns and blamed residents for their own problems.

45.     Since 2016, the City has told residents who complain about their water quality that those complaints are unique to them and do not reflect the overall quality of the water. In some cases, the City has told its residents to replace their water heater, prompting some to needlessly incur thousands to do so.

46.      The City has also gone to great lengths to ignore all warnings about its water quality, coming up with head-scratching explanations as to why the water remains safe despite evidence to the contrary. For example, when residents approached the City with independent lab testing revealing extremely high lead levels in their drinking water, officials dismissed the validity of the lab results as done improperly—even though tests came from different, independent, EPA-certified labs.

47.     All told, the City's defiance has only exacerbated the harms to its residents. Many have unwittingly continued to use and consume the water to their own detriment. Others have spent countless hours and money pointlessly attempting to remedy the problem in their homes.

And they have had to deal with the overwhelming emotional distress of protecting their family's health, all while fighting the City which refuses to work with them.

**E.  Plaintiffs' experiences with Sycamore water demonstrate the problems with Sycamore water and the City's attempts to obfuscate the same.**

    **1.  Jennifer Campbell**

48.  On or about summer 2016, the cold water at Jennifer Campbell's home on Edward Street in Sycamore developed a repulsive odor that reoccurred daily. Ms. Campbell made many calls to the water department during the course of a month to complain, but the City assured Ms. Campbell that nothing was wrong with the City's water supply. According to the City, her home's water heater was causing the foul odor. The City recommended that Ms. Campbell drain the water heater and remove the anode rod.

49.  Despite these efforts, the problems persisted, so Ms. Campbell continued to call Sycamore's water department for more information. Ms. Campbell stressed that the smell was most prominent with the cold water, but the City again blamed the water heater.

50.  Around this time, Ms. Campbell's neighbor also began reporting the same issues to the City. Each time, the City claimed that they were the only residents experiencing issues. Eventually, the City placed a hydrant and autoflusher directly across the street from the Campbell's home at 437 Edward Street. This temporarily appeared to help the smell subside.

51.  Yet, in the following three years, the issues returned as soon as the weather warmed. When Campbell re-raised her concerns, once again the City blamed the water heater and told Campbell to drain her water heater—which didn't help. The City never took any action, other than adjusting the run times of the autoflusher outside the Campbell's house.

52.     Finally, in May 2020, the odor returned, only this time much stronger and more constant than any other year, and the water ran from the spigot as a brownish-yellow color. Again, the complaints of Campbell and her neighbor went ignored, and again the City merely blamed the water heater for causing any smells. Fed up, Campbell replaced the water heater entirely. The foul smell only intensified.

53.     Throughout the summer, Campbell continued to raise concerns with the City. She also began hearing from dozens of other residents online, who expressed similar complaints. She attended multiple city council meetings, and sent her water to a lab to be tested.

54.     Her initial test revealed lead levels of 12 ppb, slightly lower than the EPA's lead action level.[13] Then, after realizing she had been misadvised how to collect her water sample, Ms. Campbell submitted another sample to a lab for testing. This sample showed lead levels of 64.5 ppb. Tests showed very low levels of chlorine.

55.     Jennifer Campbell has, along with other residents, continued to express concern at city council meetings throughout 2020, only to be told repeatedly that the water is safe to drink.

56.     The entire ordeal has been physically, financially, and emotionally draining for Campbell. As a result of the City's actions, omissions, misrepresentations, and negligence, she has suffered actual damages.

---

[13] "The lead action level is a measure of the effectiveness of the corrosion control treatment in water systems. . . . To check if corrosion control is working, EPA requires water systems to test for lead at the tap in certain homes, including those with lead service lines. Systems compare sample results from homes to EPA's action level of 0.015 mg/L (15 ppb). If 10 percent of the samples from these homes have water concentrations that are greater than the action level, then the system must perform actions such as public education and lead service line replacement." EPA, *Understanding the Lead and Copper Rule*, (Sept. 2020), https://www.epa.gov/sites/production/files/2019-10/documents/lcr101_factsheet_10.9.19.final_.2.pdf. The lead action level is ***not*** a safety standard, as there is no "safe" level of lead in one's drinking water. *See id.* Levels as low as 5 ppb are a cause for concern. *See* Alison Young, *How much lead in water poses an imminent threat?*. USA TODAY (updated Mar. 17, 2016), *available at* https://www.usatoday.com/story/news/nation/2016/03/16/what-lead-levels-in-water-mean/81534336/.

**2.      Jeremy Pennington**

57.      In the spring of 2016, Jeremy Pennington and his family noticed a sharp decrease in the quality of their water supply. The water had become discolored, and developed a hard, foul odor. This prompted Pennington to contact the City—especially since he was paying a significant amount monthly on his water bill.

58.      Pennington asked if City construction or projects had been going on that would cause the odor and discoloration. The City told him no. It also assured him that he was the only person who had voiced any concern.

59.      Pennington's water quality problems persisted through the summer. Then, in approximately early-autumn 2016, Pennington's fridge, water softener, and dishwasher all failed. So, again, Pennington reached out to the water department. And, again, the City assured him that Sycamore's water was safe to drink. It also advised him to replace his hot water heater and rent a water softener.

60.      The Penningtons took the City's advice and replaced the water heater and water softener. But that solved nothing. Instead, excessive sediment from the City's water supply destroyed the new water softener. The water also claimed the washing machine. In fact, over roughly one year, Pennington had to replace nearly every home appliance that uses water.

61.      In October 2020, Pennington had his water tested by a private laboratory, Clean Water Testing in Appleton, Wisconsin. The test revealed lead levels of 8.4 ppb.

62.      The entire ordeal has been physically, financially, and emotionally draining for Pennington. As a result of the City's actions, omissions, misrepresentations, and negligence, he has suffered actual damages.

## V.    CLASS ALLEGATIONS

63.     Plaintiffs bring this action on behalf of themselves and all others similarly situated under Federal Rule of Civil Procedure 23(a) and (b)(3), as representatives of a class defined as follows:

> All individuals and entities who, from January 1, 2000, to present, owned property or resided within the City of Sycamore.

64.     Members of the class are so numerous that joinder of all members is impracticable. The Class is readily identifiable from real estate records, census data, and documents maintained by the City.

65.     Plaintiffs' claims are typical of those belonging to other members of the class. Plaintiffs and the class were damaged by the same wrongful conduct—the City's negligent maintenance of the water supply, the City's constitutional violations, the public nuisance created by the City, and the City's fraudulent representations regarding Sycamore's water quality and safety.

66.     Plaintiffs will fairly and adequately protect and represent the interests of the class. The interests of plaintiffs coincide with—and do not conflict with—those of the other members of the class.

67.     Plaintiffs' counsel is experienced in the prosecution of class action litigation and has extensive particular experience with class action litigation involving environmental dangers or contaminants.

68.     Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members because the City has acted on grounds

generally applicable to the entire class. Such generally-applicable conduct is inherent in the City's wrongful conduct.

69.     Questions of law and fact common to the class include, but are not limited to:

a.   Whether the City misrepresented the quality of Sycamore's water quality at public meetings and in public statements;

b.   Whether the City manipulated or negligently conducted EPA testing under the Lead and Copper Rule;

c.   Whether the City negligently maintained its water system, and if so, whether that negligence proximately caused lead, iron, bacteria, or other contamination of the public water supply; and

d.   Whether the City violated the 14th amendment due process rights of the Class.

70.     Plaintiffs and members of the class have all suffered, and will continue to suffer, harm and damages as a result of the City's unlawful and wrongful conduct.

71.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Absent a class action, most members of the class likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law. The

class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication. Additionally, the City has acted and failed to act on grounds generally applicable to plaintiffs and the class and requires court imposition of uniform relief to ensure compatible standards of conduct toward the class, thereby making appropriate equitable relief to the class as a whole within the meaning of Rules 23(b)(1) and (b)(2).

72.     Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VI.     COUNTS

### FIRST COUNT:
### 14th Amendment Substantive Due Process - 42 U.S.C. § 1983 (Bodily Integrity)

73.     Plaintiffs and the Class incorporate by reference all of the foregoing allegations.

74.     Plaintiffs and the Class have a clearly established fundamental right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to bodily integrity.

75.     The conduct of the City, all while acting under color of law, endangered and/or threatened Plaintiffs' fundamental liberty interest to bodily integrity as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

76.     The City was aware that its conduct could result in the deprivation of Plaintiffs' fundamental due process rights to bodily integrity.

77.     The City deliberately and knowingly breached the constitutionally protected bodily integrity of Plaintiffs by creating and perpetuating the ongoing exposure to contaminated water,

with deliberate indifference to the known risks of harm which said exposure would, and did, cause to Plaintiffs.

78.     The City had the opportunity to reflect and deliberate before it acted and/or failed to act.

79.     As a direct and proximate result of the aforementioned unconstitutional acts of the City, which violated Plaintiffs' fundamental property and/or liberty rights to bodily integrity, as alleged in this Class Action Complaint, Plaintiffs suffered extensive damages, including, but not limited to:

- Substantial economic losses from medical expenses, abatement measures, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

- Serious and in some cases life threatening and irreversible bodily injury; and

- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress-related physical symptoms.

80.     The conduct of the City was both reckless and outrageous, entitling Plaintiffs and the Class to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. § 1988.

### SECOND COUNT:
### 14th Amendment Substantive Due Process - 42 U.S.C. § 1983 (State-Created Danger)

81.     Plaintiffs and the Class incorporate by reference all of the foregoing allegations.

82.     Plaintiffs and the Class have a clearly established right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to be protected

from risks, dangers, dangerous situations, or being made more vulnerable to increased risk of harms, affirmatively created and/or caused by persons acting under color of state law.

83.     The City, while acting under color of state law, affirmatively created or exacerbated the dangers and dangerous situations to which Plaintiffs were exposed, making them more vulnerable to said dangers, and the City did so with an extreme degree of culpability.

84.     The City, while acting under color of state law, affirmatively continued, increased and perpetuated the dangers, risks of harm, and dangerous situations creating the public health crisis, when it deliberately and affirmatively denied, lied about, covered up, deceived, discredited, and ignored said known dangers and risks of harm to which it exposed Plaintiffs, making them more vulnerable to said dangers.

85.     The City was aware that their conduct could result in the deprivation of Plaintiffs' due process rights to be protected from the dangers, dangerous situations, or being made more vulnerable to the dangers affirmatively created and perpetuated by them.

86.     This conduct was reckless, deliberately indifferent, and/or so outrageous as to shock the conscience, such that it was culpable in the extreme, insofar as the City knew of and disregarded the substantial risk of serious harm to Plaintiffs.

87.     The dangers and risks of harm were discreet and special to Plaintiffs, as Sycamore water users and property owners in particular, and not risks affecting the public at large.

88.     The dangers and risks of harm to Plaintiffs from the ongoing exposure to the water toxins which were created and perpetuated by the City, were so extreme as to be equivalent to private acts of violence visited upon them.

89.     These actions of the City, all under color of law, constituted affirmative acts that caused and/or substantially increased the risks of physical, emotional, and economic harm to the Plaintiffs.

90.     As a direct and proximate result of the aforementioned unconstitutional acts of the City, which, through the creation of state-created danger, violated Plaintiffs' fundamental property and/or liberty rights, as alleged in this Class Action Complaint, Plaintiffs suffered extensive damages, including, but not limited to:

- Substantial economic losses from medical expenses, abatement measures, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

- Serious and in some cases life threatening and irreversible bodily injury; and

- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

91.     The conduct of the City was reckless and outrageous, entitling Plaintiffs and Class members to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. § 1988.

### THIRD COUNT:
### Public Nuisance

92.     Plaintiffs and the Class incorporate by reference all of the foregoing allegations.

93.     Plaintiffs and the Class have a public and common right to clean and safe drinking water.

94.     The City has materially interfered with that public right, creating common injuries to Plaintiffs and the Class, and endangering public health.

95.     The City's actions and omissions regarding Sycamore's water system have proximately caused toxic levels of lead, heavy metals, and bacteria to contaminate the drinking water, rendering it dangerous to consume and practically useless for other purposes.

96.     In short, the City's actions and omissions have created and exacerbated a public nuisance that interferes with the Plaintiffs' and Class members' full, safe, and peaceful enjoyment of their property and drinking water.

97.     As a result, Plaintiffs and the Class are entitled to injunctive relief remediating the nuisance, and damages compensating for any harm caused, as well as punitive damages, costs, and reasonable attorney fees.

### FOURTH COUNT:
### Negligence

98.     Plaintiffs and the Class incorporate by reference all of the foregoing allegations.

99.     The City has a duty to provide clean and safe drinking water to Plaintiffs and the Class.

100.     The City breached that duty by its actions and omissions while maintaining Sycamore's water system.

101.     Those actions and omissions have proximately caused toxic levels of lead, heavy metals, and bacteria to contaminate the drinking water, rendering it dangerous to consume and practically useless for other purposes.

102.     As a result of the City's actions and omissions, Plaintiffs and the Class have suffered extensive damages, including but not limited to:

- Substantial economic losses from medical expenses, abatement measures, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

- Serious and in some cases life-threatening and irreversible bodily injury; and

- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

103.     The conduct of the City was negligent, entitling Plaintiffs and Class members to an award of punitive damages, as well as costs and reasonable attorney fees.

### FIFTH COUNT:
### Illinois Consumer Fraud and Deceptive Business Practices Act - 815 ILCS 505/1, *et seq.*

104.     Plaintiffs and the Class incorporate by reference all of the foregoing allegations.

105.     The City has routinely misrepresented that Sycamore's drinking water is safe to drink and meets all EPA standards. The City has also, in response to complaints by residents, claimed Plaintiffs and the Class are responsible for any contamination in their respective drinking water supplies.

106.     The City's statements regarding the quality and safety of the water were false, deceptive, and misleading, and the City knew or should have known that they were deceptive, false, and misleading at the time it made them.

107.     The City made deceptive, misleading, and false statements with the intent that Plaintiffs and the Class rely on them.

108.     The City's misrepresentations regarding the quality of Sycamore's water violate the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, and have

proximately caused Plaintiffs and the Class to suffer extensive damages, including but not limited to:

- Substantial economic losses from medical expenses, abatement measures, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;
- Serious and in some cases life-threatening and irreversible bodily injury; and
- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress-related physical symptoms.

109.    Plaintiffs and the Class members are entitled to an award of actual economic damages, punitive damages, injunctive relief, and reasonable attorney fees under 815 ILCS 505/10a.

## Sixth Count:
### Fraud

110.    Plaintiffs and the Class incorporate by reference all of the foregoing allegations.

111.    The City has routinely represented that Sycamore's drinking water is safe to drink and meets all EPA standards. The City has also, in response to complaints by residents, claimed Plaintiffs and the Class are responsible for any contamination in their respective drinking water supplies.

112.    The City's statements regarding the quality and safety of the water were false, and the City knew they were false at the time it made them.

113.    The City made the false statements with the intent that Plaintiffs and the Class rely on them.

114.    To their detriment, Plaintiffs and the Class relied on the false statements made by the City. And as a result of the City's fraud, Plaintiffs and the Class have suffered damages extensive damages, including but not limited to:

- Substantial economic losses from medical expenses, abatement measures, lost wages, lost income, lost or impaired earning capacity, lost business profits, and reduced property values, among others;

- Serious and in some cases life-threatening and irreversible bodily injury; and

- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress-related physical symptoms.

115.    Plaintiffs and the Class members are entitled to an award of punitive damages, as well as costs and reasonable attorney fees.

## VII.    PRAYER FOR RELIEF

116.    Plaintiffs request the following relief from the Court:

- An injunctive order to abate the public nuisance created and exacerbated by the City's gross negligence including, but not limited to: replacing all water mains installed prior to 1960, establishing an adequate corrosion control method;

- An order certifying damages classes pursuant to Fed. R. Civ. P. 23(b)(3), injunctive relief classes pursuant to Fed. R. Civ. P. 23(b)(2), and an issue class pursuant to Fed. R. Civ. P. 23(c)(4);

- An order declaring the conduct of the City unconstitutional;

- An injunctive order to remediate the harm caused by the City's unconstitutional conduct including, but not limited to: repairs of private property and establishment of medical monitoring to provide health care and

other appropriate services to Class members for a period of time deemed

appropriate by the Court;

- ▪ Appointment of a monitor who will assist in the development of remedial plans

  including, but not limited to: early education, education intervention programs,

  criminal and juvenile justice evaluations;

- ▪ An order for an award of compensatory damages;

- ▪ An order for an award of punitive damages;

- ▪ An order for an award of exemplary damages;

*     *     *

Respectfully submitted, on October 30, 2020, by:

HAGENS BERMAN SOBOL SHAPIRO LLP

*/s/ Steve W. Berman*
Steve W. Berman
1301 2nd Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Mark T. Vazquez
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4962
Facsimile: (708) 628-4952
markv@hbsslaw.com

*Attorneys for Plaintiffs and the Class*